# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| GARY POPOLI | *<br>*<br>* |
| v. | *     Civil No. JFM-16-00452<br>*<br>* |
| BOARD OF TRUSTEES OF<br>HARFORD COMMUNITY COLLEGE | *<br>*<br>*<br>* |

********

## MEMORANDUM

Plaintiff Gary Popoli ("Popoli") brings this lawsuit against defendant Board of Trustees of Harford Community College ("HCC") seeking damages for alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981 and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Now pending is defendant HCC's motion for summary judgment. (ECF No. 20). The parties have fully briefed the motion, and no oral argument is necessary. *See* Local R. 105.6. For the reasons set forth below, defendant's motion for summary judgment is granted.

## BACKGROUND

This dispute arises out of HCC's allegedly discriminatory decision not to hire Popoli for a full-time faculty position for which Popoli applied. (ECF No. 1). Defendant Board of Trustees of Harford Community College is the entity empowered under Maryland law to sue and be sued on behalf of Harford Community College, a community college located in Maryland. (*Id.* ¶ 5). Plaintiff Popoli is a male resident of Maryland who was 57 years old at the time of the events at issue. (*Id.* ¶ 4).

Popoli began teaching at HCC in 1992 as an adjunct professor of psychology. (ECF No. 29-4, p. 6). He has a Ph.D. in Developmental Psychology. (ECF No. 29-14, p. 2). He continued teaching at the school until the spring of 2014, typically teaching three class sessions each semester and one in the summer. (ECF. No. 29-4, p. 6). Within that time period, Popoli held a temporary full-time position at HCC during the fall semester of 2011. (ECF No. 29-4, p. 9-10).

In October 2013, HCC solicited applications for a tenure track, full-time psychology faculty position. (ECF No. 29-18, p. 2). During the selection process, two additional faculty positions opened up, so the search expanded to fill all three open positions. (ECF No. 20-26, p. 1). A search committee ("Committee") for HCC handled the applications and conducted the interviews. (ECF No. 1 ¶ 14). The Committee had six members: (1) Avery Ward, the hiring manager; (2) Jan Brewer, Assistant Professor of Sociology at HCC; (3) Rick Mitchell, Professor of Psychology; (4) Nicole Hoke-Wilson, Director of Disability and Student Intervention Services; (5) Orlando Correa, Associate Professor of Psychology; and (6) Stephanie Hallock, Professor of Political Science and Coordinator for Global Education. (ECF No. 20-1, p. 13). The male members of the Committee were in their sixties or seventies. (ECF No. 20-1, p. 13). The Committee met at the end of October for an initial meeting to review search procedures and overview the search process. (ECF No. 20-45, p. 14).

HCC received 54 applications in total, including one from Popoli. (ECF No. 20-12, p. 1-2). The applicants were rated on a scale of 1-5, with 5 being the best, on seven criteria: (1) education, (2) experience, (3) ability to teach psychology courses using various methods of technologies, (4) experience developing online materials for face-to-face and online courses, (5) experience or ability in assessing student learning and reporting results for institutional accountability, (6) experience with and understanding of curriculum development, and (7)

quality of application materials. (ECF No. 20-16, p. 1). Popoli received high ratings in education and experience, but low marks in areas such as curriculum development. (ECF No. 20-14, p. 4). He was rated as the tenth-best overall candidate. (ECF No. 29-17, p. 2). The committee met again in early November and selected eight candidates to interview, including Popoli.[1] (ECF No. 29-17, p. 2).

Seven of those selected underwent the first round of interviews.[2] (ECF No. 20-22, p. 1). Five candidates were scheduled for one-hour interview slots, while Popoli and one other candidate were scheduled for forty-five minute slots. (ECF No. 29-23, p. 2). Two of the candidates interviewed via Skype while the others, including Popoli, interviewed in person. (ECF No. 29-23, p. 2). The search committee posed the same nine questions to all of the candidates. (ECF No. 29-8, p. 4). The Committee discussed strengths and concerns of each candidate after each interview. (ECF 29-8, p. 8). Popoli's interview lasted about ten minutes. (ECF 20-43, p. 6).

Six candidates, including Popoli, advanced to the second round of interviews in January 2014.[3] (ECF No. 29-22, p. 2). One component of the second interview was a teaching demonstration where applicants were instructed to give a fifteen minute lesson on attribution theory and to "[t]each the lesson as if the Search Committee members represent your students." (ECF No. 20-27, p. 1). Both parties agree Popoli's teaching demonstration was not interactive. (*See* ECF No. 29-21, p. 7; ECF No. 29-4, p. 13). By contrast, Committee members noted the

---

[1] The other candidates chosen for interviews were (1) Regina Roof-Ray; (2) Amy Bennett; (3) Leslie Angel; (4) Elizabeth Mosser; (5) Samantha Bergmann; (6) Dawn Brett; and (7) Parita Vithlani. (ECF No. 20-1, p. 15).
[2] Leslie Angel declined an interview and withdrew her application, leaving only seven candidates. (ECF No. 20-1, p. 15).
[3] Amy Bennett was not invited to a second interview after she expressed doubt during her initial interview about her ability to connect with community college students after teaching at a four-year university. (ECF No. 20-1, p. 18).

candidates who were ultimately selected for the positions presented interactive demonstrations. (*See* ECF No. 29-21).

The other component was the second interview itself, which immediately followed the teaching demonstration. (ECF No. 20-27, p. 1). After the second round of interviews, the search committee recommended four of the six remaining candidates as finalists for the vacant positions.[4] (ECF No. 29-21, p. 2). Popoli was not among the finalists. (*Id.*). From the finalist list, three female applicants, aged 28, 31, and 44, were selected to fill the vacant positions. (ECF No. 1 ¶ 17). Those selected were Roof-Ray, Mosser, and Vithlani. (ECF No. 20-29, p. 1). None of these applicants had a doctoral degree, whereas Popoli did. (ECF No. 1 ¶ 17). Popoli was notified of his non-selection in a letter in February 2014. (*Id.* ¶ 19). This letter did not recite a specific reason for his non-selection. (*Id.*).

On March 31, 2015, the EEOC issued a Determination finding there was reasonable cause to believe Popoli was denied a full-time psychology faculty position because of his age and sex. (ECF No. 1 ¶ 22). Popoli filed a complaint in the District of Maryland on February 17, 2016, alleging two counts of discrimination in connection with his non-selection for the vacant positions. (*Id.*). First, Popoli claims his non-selection was motivated, at least in part, by his sex, constituting unlawful discrimination in violation of Title VII (Count 1). (*Id.* ¶¶ 28, 30). Second, Popoli claims his non-selection was based on his age, constituting unlawful discrimination in violation of the ADEA (Count 2). (*Id.* ¶ 38). HCC moved for summary judgment on April 25, 2017. (ECF No. 20).

---

[4] Roof-Ray, Mosser, Vithlani, and Bergmann were recommended. (ECF No. 20-28, p. 1).

## STANDARD

Under Federal Rule of Civil Procedure 56(c), a court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986). A genuine issue of material fact exists where, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When reviewing a motion for summary judgment, the court must take all facts and inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The party opposing summary judgment must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). The non-movant "'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)); *see also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 160 (1970). A court should enter summary judgment when a party fails to make a showing sufficient to establish elements essential to a party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

**ANALYSIS**

Plaintiff asserts two claims against defendant: sex discrimination in violation of Title VII (Count I) and age discrimination in violation of the ADEA (Count II). In response, defendant argues its hiring decision was not discriminatory and plaintiff's age discrimination claim under the ADEA is barred by the Eleventh Amendment to the United States Constitution. I consider each claim in turn.

### I.  Title VII Sex Discrimination Claim

Plaintiff alleges defendant impermissibly discriminated against him on the basis of his sex by not hiring him for the full-time faculty position for which he applied. Defendant contends plaintiff has not identified a genuine dispute of material fact and defendant's decision not to hire plaintiff was not discriminatory. I agree with defendant and grant summary judgment with respect to Count 1 of plaintiff's complaint.

*i.   Legal Standard*

Title VII prohibits employers from failing to or refusing to hire an individual because of the individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2. In the absence of direct or indirect evidence of an employer's discrimination, a plaintiff can meet his or her burden under Title VII by relying on the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting framework.

To establish a prima facie case of discriminatory hiring, a plaintiff must show "(1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998). Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a

legitimate, nondiscriminatory reason for the employee's rejection. *McDonnell Douglas Corp.*, 411 U.S. at 802-03. If the defendant carries this burden, then the plaintiff must prove, by a preponderance of the evidence, both that the defendant's proffered reason was not the true reason for the employment decision and that the proffered reason was a pretext for discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). A plaintiff in a Title VII case can establish pretext either "by showing that he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006).

First, the plaintiff can satisfy his burden by "show[ing] that [his] qualifications were so plainly superior that the employer could not have preferred another candidate." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 648 n.4 (4th Cir. 2002). Under this method, the court must assess relative job qualifications in terms of the criteria the employer deemed relevant to the position in question. *Heiko*, 434 F.3d at 259 (citing *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 296 (4th Cir. 2005)). The employer does not need to objectively prove the person hired was more qualified than the plaintiff. *Featherson v. Montgomery Cty. Pub. Sch.*, 739 F. Supp. 1021, 1028 (D. Md. 1990). Courts do not operate as "super-personnel department[s] determining whether [an employer's] perception of an employee's qualifications is erroneous." *Evans v. Techs. Applications & Servs. Co.*, 875 F. Supp. 1115, 1120 (D. Md. 1995), *aff'd sub nom. Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954 (4th Cir. 1996) (citing *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)). Finally, the plaintiff's perceptions of his own qualifications are irrelevant to this determination. *Id.*

Second, the plaintiff can show pretext by, "provid[ing] evidence that the employer's proffered reason was not the actual reason relied on, but was rather a false description of its

reasoning...manufactured after the fact." *Dennis*, 290 F.3d at 648-49 & n. 4 (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981)). Such evidence does not necessarily establish intentional discrimination, but it can permit an inference of such discrimination when combined with the elements of the prima facie case. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-47 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose"). The plaintiff's mere speculations, however, "are insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment." *Langerman v. Thompson*, 155 F. Supp. 2d 490, 499 (D. Md. 2001) (citations omitted).

The employer's process of evaluation and selection is one factor to consider in determining whether the plaintiff has demonstrated pretext. *See Featherson*, 739 F. Supp. at 1027-28 (considering the selection process of the employer in analyzing plaintiff's pretext argument). Where the employer uses a standardized selection process, there is less likely to be an inference of discrimination. *See id.* By contrast, subjective evaluation processes may be subject to strict scrutiny, but "the mere fact that subjective criteria are involved in the reason articulated by an employer does not prevent according it sufficient rebuttal weight to dispel the inference of discrimination raised by the prima facie case." *Love v. Alamance Cty. Bd. of Educ.*, 757 F.2d 1504, 1507 (4th Cir. 1985). In deciding whether the subjectivity in the process led to discriminatory decisions, courts can look at the makeup of the hiring committee. *Langerman*, 155 F. Supp. 2d at 500. The employment decision will be subject to particularly close scrutiny where the committee does not contain members of the plaintiff's protected category. *Id.* (citing *Page v. Bolger*, 645 F.2d 227, 230 (4th Cir. 1981)).

Additionally, a plaintiff's showing of procedural flaws in an employer's selection process, absent a showing that the employer considered any unlawful criteria, is insufficient to meet the plaintiff's burden. *Langerman*, 155 F. Supp. 2d at 500-01 ("Title VII is only designed to remedy discrimination based on one's sex, race or other protected category. The statute is not meant to remedy every procedural flaw that exists in an employer's selection process"). Similarly, an employer's failure to follow its own internal procedures does not necessarily establish intentional discrimination, unless the plaintiff can show the employer's failure to follow such procedures was the result of unlawful discrimination. *Langerman*, 155 F. Supp. 2d at 498-99.

### ii. *Prima Facie Case*

It is undisputed Popoli has established a prima facie case of discrimination. (ECF 20-1, p. 40). Popoli, as a male applicant, was a member of a protected class. He applied and was qualified for the full-time psychology faculty position with HCC. Finally, Popoli was rejected for the position under circumstances giving rise to an inference of unlawful discrimination in that the open positions were filled by female applicants. *See Langerman*, 155 F. Supp. 2d at 495-96 ("In cases where the position sought was filled, the fourth prong is most easily satisfied by showing that someone outside of the plaintiff's protected group ultimately was selected for the position.") (citing *Equal Emp't Opportunity Comm'n v. Sears Roebuck and Co.*, 243 F.3d 846, 851 (4th Cir. 2001)).

### iii. *Non-Discriminatory Reason*

HCC has carried its burden in offering a legitimate, nondiscriminatory reason for the employee's rejection. Specifically, HCC claims it did not select Popoli for the position because Popoli performed poorly in the second interview and the teaching demonstration compared to the

other applicants. (ECF No. 20-1, p. 40). For example, Jan Brewer described Popoli as "flippant" and "condescending" in his second interview." (ECF No. 29-8, p. 9). She explained, "We asked if there were any other questions he had, and he said, I already answered you this the first time you asked me in the very first interview." (ECF No. 29-8, p. 9). She continued, "Wow was my thought…I was floored…We wanted you to pull it all out, sell yourself, tell us how much this really means to you, say something more than these short, brief, little answers that you're giving us, and that snarky ending was just very resonating." (ECF No. 29-8, p. 9). Popoli does not dispute this characterization of the second interview. He instead attempts to argue HCC had decided not to hire him even before the second interview. This argument is addressed below. The Committee noted that the selected candidates used the second interview as an opportunity to showcase their abilities. (ECF No. 20-1, p. 25).

The Committee had similar negative feedback about plaintiff's teaching demonstration. One member of the Committee testified Popoli, "did not have interactive activities or an approach to engage us as students in the development of the material." (ECF No. 20-45, p. 24). Another testified, "it wasn't at all like a role play." (ECF No. 29-9, p. 8). By contrast, the Committee noted in the interview notes that the selected candidates used interactive methods for their demonstrations. (*See* ECF No. 29-21). These notes stated Roof-Ray "brought the students along in the learning experience." (ECF No. 29-21, p. 5). Similarly Vithlani, "provided context for the theory in terms of family life, current events, and explained why attribution theory is useful." (ECF No. 29-21, p. 6). Additionally, Mosser "was interactive with students." (ECF No. 29-21, p. 3).

*iv.    Pretext*

Popoli has failed to meet his burden of showing HCC's reason for not selecting him was a pretext for discrimination. Popoli first attempts to show pretext by arguing his qualifications were plainly superior to at least two of the three candidates who were chosen for the positions. Popoli rests this assertion on two measures of qualifications. First, Popoli has a Ph.D. whereas the candidates who were selected for the position have Masters degrees. (ECF No. 29, p. 18). A Ph.D., however, was not a required or preferred credential. (ECF 20-1, p. 45; ECF 20-3). Because HCC did not deem this degree to be an important qualification, Popoli cannot rest his plainly superior qualifications argument on this credential.

Second, Popoli claims he had more years of teaching experience than at least two of the candidates chosen for the position. (ECF No. 29, p. 18). Popoli had more than 26 years of part-time psychology teaching experience, mostly at community colleges. (ECF No. 29, p. 18). This experience, however, was not plainly superior to those selected. Roof-Ray and Vithlani had more full-time teaching experience than Popoli, and Mosser had seven years of experience teaching at two universities and three community colleges. (ECF No. 20-1, p. 45). Moreover, as HCC points out, measuring teaching experience is not a simple matter of counting the number of credits each candidate has taught. (ECF No. 20-1, p. 31). Instead, HCC was looking at the depth of each candidate's experiences. (ECF No. 20-3, p. 1). The three selected candidates did more than just teach classes while working as faculty, giving their teaching experiences more depth than Popoli's. (ECF No. 20-1, p. 45). For example, Vithlani chaired a curriculum development committee during her time as a teacher. (ECF No. 20-1, p. 32). Mosser was involved in college service at HCC and part of a professional development committee at Towson designated to exploring advances in learning and curricular materials. (ECF No. 20-1, p. 33). Roof-Ray

mentored new adjuncts while teaching. (ECF No. 20-1, p. 33). Because HCC was looking for more than just total years of teaching experience, Popoli fails to show the candidates selected were so inferiorly qualified as to suggest an inference of discrimination.

Additionally, Popoli himself acknowledges that the most important qualification for the position was not just teaching experience, but also teaching ability. (ECF No. 29, p. 4; ECF No. 29-12, p. 7). Although HCC uses teaching experience to initially approximate teaching ability, the teaching demonstration portion of the interview process was the critical method of demonstrating teaching ability to the Committee. (ECF No. 29, p. 4; ECF No. 32, p. 2; ECF No. 29-12, p. 7). Popoli does not dispute HCC's characterization of his teaching demonstration as being too formal and unengaging. (ECF No. 32, p. 5). In fact, Popoli essentially admitted these criticisms were accurate, testifying he had trouble both treating the Committee as if they were students and finding ways to bring the "students" into the lesson. (ECF No. 20-43, p. 8-9). He stated, "[I]t's all theoretical. So you can't engage them. You can't ask them questions. You can't ask them to give examples because it's too abstract...[A]ll you can do is lecture them." (ECF No. 20-43, p. 8-9). The selected candidates, however, did give interactive demonstrations. (ECF No. 20-1, p. 24). Therefore, Popoli has not shown he was plainly more qualified than the selected candidates who undisputedly outperformed him in the demonstration. (ECF No. 20-1, p. 24)

Popoli next attempts to show pretext through circumstantial evidence. He claims this evidence suggests his sex played a role in the Committee's decision-making process, therefore establishing pretext. (ECF No. 29, p. 19).

First, he claims the Committee had made its decision not to hire Popoli for the position before his second interview and the teaching demonstration. (ECF No. 29, p. 20). Popoli takes

this stance because one of the Committee members, Jan Brewer, used the phrase "courtesy interview" in her deposition. (ECF No. 29, p. 20). Even viewed in the light most favorable to Popoli, however, Ms. Brewer's testimony does not support the conclusion that the Committee had already made its decision not to hire Popoli before the second interview. To the contrary, Popoli's counsel asked Ms. Brewer, "So basically the committee had already decided that he wasn't going to be getting the position...but because of his time with the College as a courtesy, they wanted to invite him back?" (ECF No. 29-8, p. 6). Ms. Brewer responded, "No, nobody said that he was not getting the position." (ECF No. 29-8, p. 6). Additionally, Orlando Correa testified it was "not true at all" that Popoli was given a courtesy interview. (ECF No. 20-46, p. 6). Instead, Correa testified Popoli was invited back to "show [the Committee] what [he] could do." (ECF No. 20-46, p. 6). No one testified the Committee had decided in advance Popoli would not be extended an offer. Viewed in context of the other evidence and in the light most favorable to Popoli, Ms. Brewer's use of the phrase "courtesy interview" is not evidence of pretext.

Popoli also argues additional evidence undermines HCC's stated reasons. (ECF No. 29, p 21). He claims concerns about his qualifications were included on a summary pros and cons sheet used by the Committee, but similar concerns about the other candidates were "inexplicably" not included on such a summary sheet. (ECF No. 29, p. 21). Ms. Brewer addressed this topic during her deposition, in which she explained the summary pros and cons sheet produced by the Committee was representative of the Committee's "consensus." (ECF No. 29-8, p. 8). As such, individual Committee members' concerns were not included on the summary sheet. (ECF No. 29-8, p. 8). This undisputed testimony provides an explanation as to why some concerns about some candidates were included while others were not. Thus, there is

no genuine issue of material fact on this issue, and this explanation does not provide evidence of pretext.

Additionally, Popoli claims he was the only candidate scheduled for a forty-five minute interview while the other candidates were scheduled for full one hour interviews. (ECF No. 29, p. 21). This statement is untrue. (ECF No. 29-23, p. 2). Samantha Bergmann, a younger, female candidate, was also scheduled for a forty-five minute interview. (ECF No. 29-23, p. 2). Moreover, Popoli himself testified his interview only lasted ten minutes anyway, and both he and Bergmann advanced to the second round. (ECF No. 20-43, p. 6). This undisputed evidence shows Popoli was not disadvantaged by his interview slot.

Further, Popoli claims female candidates were favored in the selection process because one candidate was permitted to have a final interview with the Vice President, Dr. Annette Haggray, before the Committee finished its second round of interviews. It is undisputed that Vithlani was given this opportunity, but HCC's explanation is also undisputed. HCC explained Vithlani interviewed with Haggray immediately after her second interview and teaching demonstration because she was the only non-local candidate. (ECF No. 32, p. 12). Vithlani had had a previous interview cancelled because of the weather, and HCC did not want her to have to return to campus again. (ECF No. 32, p. 12). Popoli acknowledged this explanation was accurate. He testified, "I do know that there was an out-of-state applicant who was allowed to meet with the president of the college, or the vice president, because they were out of state." (ECF No. 20-43, p. 11-12). Even though this process was an aberration from HCC's standard interview process, Popoli himself testified that the reason behind the aberration was to accommodate the only non-local candidate, not to offer preferential treatment to a younger, female candidate.

Finally, Popoli claims the female candidates were favored because Vithlani was allowed to interview by Skype while other candidates were not. (ECF No. 29, p. 21). This statement is untrue. Two other candidates in addition to Vithlani were scheduled for Skype interviews. (ECF No. 29-23, p. 2). More importantly, Popoli fails to explain how interviewing via Skype was an advantage to Vithlani and a disadvantage to himself. (ECF No. 29, p. 22). Additionally, even if allowing some candidates to interview via Skype while requiring others to interview in person did violate the College's Guide to Hiring,[5] this failure to follow internal procedures does not suggest HCC was motivated by illegal discriminatory intent. (ECF No. 29, p. 22).

Other evidence also weighs against a finding of discrimination in HCC's non-selection of Popoli. The Committee's selection process was standardized, suggesting HCC's bases for choosing a candidate were not discriminatory. For example, the interview questions were scripted, and the Committee members did not deviate from the script during the interviews. (ECF No. 29-8, p. 4). Additionally, there were male members of the Committee. (ECF No. 29, p. 2). These undisputed facts, combined with those previously discussed, demonstrate that HCC's proffered reasons for not selecting Popoli were not a pretext for discrimination. Accordingly, no reasonable factfinder could conclude that HCC's decision not to hire Popoli was discriminatory on the basis of his sex.

---

[5] Plaintiff claims the inconsistency in interview methods violated the College's Guide to Hiring HCC Employees. (ECF No. 29, p. 22). Defendant claims a different version of the guide was in place at the time of Popoli's interviews that did not contain this same requirement. (ECF No. 32, p. 13). This fact, however, is not material because even assuming plaintiff is correct, plaintiff has failed to show how HCC's failure to follow one internal hiring procedure suggests plaintiff was impermissibly discriminated against in the hiring process.

## II. ADEA Age Discrimination Claim

Plaintiff alleges defendant impermissibly discriminated against him on the basis of age in its decision not to hire plaintiff for the open positions. Defendant contends it is immune from this suit under the Eleventh Amendment. I agree with defendant and grant summary judgment with respect to Count II of plaintiff's complaint.

The Eleventh Amendment bars suits against nonconsenting states in federal court. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). This guarantee acts to bar private individuals from suing states in federal courts to recover money damages, unless the state has waived its sovereign immunity or abrogated that immunity. *Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35-36, 43-44 (2012). Eleventh Amendment immunity extends to suits against agencies and instrumentalities of the state. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984); *Gray v. Laws*, 51 F.3d 426, 431 (4th Cir. 1995). Under Maryland law, community colleges are state entities. *Adams v. Montgomery Coll. (Rockville)*, No. DKC-09-02278, 2010 WL 2813346 (D. Md. July 15, 2010) (citing *Samuels v. Tschechtelin*, 763 A.2d 209, 230 (Md. Ct. Spec. App. 2000)). Thus, sovereign immunity applies to them. *Id.*

*Ex parte Young* provides an exception to the general law, permitting prospective injunctive relief to correct an ongoing violation if the suit is brought against state officials in their official capacities. 209 U.S. 123 (1908). To avoid an Eleventh Amendment bar to suit under this doctrine, the complaint must "alleg[e] an ongoing violation of federal law and see[k] relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

There was no waiver of HCC's Eleventh Amendment immunity from suit in federal court. Additionally, the ADEA was not a valid abrogation of the states' Eleventh Amendment

immunity from monetary damage claims. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91 (2000). Popoli concedes his claims are barred: "Dr. Popoli acknowledges that his monetary claims for relief under the ADEA are precluded by the Eleventh Amendment." (ECF No. 29, p 22).

Popoli requests the court allow him to file an amended complaint substituting an individual member of the Board of Trustees of Harford Community College as a defendant in this case. (ECF No. 29, p 22). This substitution, however, does not remove the Eleventh Amendment bar to his claim. Popoli's claim is not an *Ex parte Young* action because it does not allege an ongoing violation of federal law. (*See* ECF No. 1). *See Verizon Md, Inc.*, 535 U.S. at 645.

Additionally, an individual member of the Board would not be an appropriate defendant because civil liability under the ADEA is limited to the employer. *See Birbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510-11 (4th Cir. 1994) (holding individual supervisors, employees, and agents of an employer are not appropriate defendants in an ADEA action). The Fourth Circuit has stated, "such personal liability would place a heavy burden on those who routinely make personnel decisions for enterprises employing twenty or more persons, and we do not read the statute as imposing it." *Id.* at 510.

Accordingly, plaintiff's request to amend his complaint is denied. Because I find this claim is barred on Eleventh Amendment grounds, I need not address the other issues raised by the motion for summary judgment as to this claim.

## CONCLUSION

For the aforementioned reasons, defendant HCC's motion for summary judgment (ECF No. 20) is granted. A separate order follows.

10/2/17
Date

J. Frederick Motz
United States District Judge